# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA

## CHARLESTON DIVISION

**KELLY YVONNE ROUSH,**

    **Plaintiff,**

**vs.**                             **CIVIL ACTION NO. 2:17-CV-01212**

**NANCY A. BERRYHILL,**
**ACTING COMMISSIONER OF**
**SOCIAL SECURITY,**

    **Defendant.**

## <u>PROPOSED FINDINGS AND RECOMMENDATION</u>

This is an action seeking review of the final decision of the Acting Commissioner of Social Security dying the Plaintiff's applications for Disability Insurance Benefits (DIB) under Title II and for Supplemental Security Income (SSI) under Title XVI of the Social Security Act, 42 U.S.C. §§ 401-433, 1381-1383f. By Order entered October 20, 2017 (Document No. 15.), this case was referred to the undersigned United States Magistrate Judge to consider the pleadings and evidence, and to submit proposed findings of fact and recommendations for disposition pursuant to 28 U.S.C. § 636(b)(1)(B). Presently pending before the Court is Plaintiff's Memorandum in Support of Judgment on the Pleadings and Defendant's Brief in Support of Defendant's Decision. (Document Nos. 12 and 13.)

Having fully considered the record and the arguments of the parties, the undersigned respectfully **RECOMMENDS** that the United States District Judge **DENY** Plaintiff's request for judgment on the pleadings (Document No. 12.), **GRANT** Defendant's request to affirm the decision of the Commissioner (Document No. 13.); **AFFIRM** the final decision of the Commissioner; and **DISMISS** this action from the docket of the Court.

**Procedural History**

The Plaintiff, Kelly Yvonne Roush (hereinafter referred to as "Claimant"), protectively filed her applications for Title II benefits and for Title XVI benefits on August 28, 2013, alleging disability beginning October 27, 2011 due to "spinal problems, cervical problems, strokes, fibromyalgia, severe edema in hips and legs, and coronary artery disease".[1] (Tr. at 175-176, 177-183, 184-189, 202.) Her claims were initially denied on October 22, 2013 (Tr. at 101-105, 106-110.) and again upon reconsideration on December 17, 2013. (Tr. at 115-117, 118-120.) Thereafter, Claimant filed a written request for hearing on January 21, 2014. (Tr. at 121-122.)

An administrative hearing was held on April 28, 2015 before the Honorable John T. Molleur, Administrative Law Judge ("ALJ"). (Tr. at 32-64.) On June 23, 2015, the ALJ entered an unfavorable decision. (Tr. at 14-31.) On August 18, 2015, Claimant sought review by the Appeals Council of the ALJ's decision. (Tr. at 248, 249-252.) The ALJ's decision became the final decision of the Commissioner on December 13, 2016 when the Appeals Council denied Claimant's Request for Review. (Tr. at 1-6.) On February 8, 2017, Claimant timely brought the present action seeking judicial review of the administrative decision pursuant to 42 U.S.C. § 405(g). (Document No. 2.) In response, the Commissioner filed an Answer and a Transcript of the Administrative Proceedings. (Document Nos. 8 and 9.) Subsequently, Claimant filed a Memorandum in Support of Judgment on the Pleadings (Document No. 12.), in response, the Commissioner filed a Brief in Support of Defendant's Decision (Document No. 13.), to which Claimant filed her Reply.

---

[1] In a subsequent Disability Report – Appeal, submitted on November 4, 2013, Claimant alleged that her conditions had overall gotten worse, to where she needed assistance walking, putting on pants and that she could no longer drive, could barely move her arms and legs and that she had become more anxious and picking at her face. (Tr. at 217.) In another Disability Report – Appeal, submitted on January 31, 2014, Claimant alleged that her back problems, fibromyalgia, and edema had worsened. (Tr. at 228.)

(Document No. 14.) Consequently, this matter is fully briefed and ready for resolution.

**Claimant's Background**

Claimant was 39 years old as of the alleged onset date, and is defined as a "younger person" throughout these proceedings. See 20 C.F.R. §§ 404.1563(c), 416.963(c). (Tr. at 39.) Claimant went to school through the ninth grade, but did not obtain a GED. (Id.) She last worked in October 2011 as a part time employee, and before that, her earnings totaled about $4,500 in 2004 through 2005. (Tr. at 39-40.)

**Standard**

Under 42 U.S.C. § 423(d)(5) and § 1382c(a)(3)(H)(i), a claimant for disability benefits has the burden of proving a disability. See Blalock v. Richardson, 483 F.2d 773, 774 (4th Cir. 1972). A disability is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable impairment which can be expected to last for a continuous period of not less than 12 months . . . ." 42 U.S.C. § 423(d)(1)(A).

The Social Security Regulations establish a "sequential evaluation" for the adjudication of disability claims. 20 C.F.R. §§ 404.1520, 416.920. If an individual is found "not disabled" at any step, further inquiry is unnecessary. Id. §§ 404.1520(a), 416.920(a). The first inquiry under the sequence is whether a claimant is currently engaged in substantial gainful employment. Id. §§ 404.1520(b), 416.920(b). If the claimant is not, the second inquiry is whether claimant suffers from a severe impairment. Id. §§ 404.1520(c), 416.920(c). If a severe impairment is present, the third inquiry is whether such impairment meets or equals any of the impairments listed in Appendix 1 to Subpart P of the Administrative Regulations No. 4. Id. §§ 404.1520(d), 416.920(d). If it does, the claimant is found disabled and awarded benefits. Id. If it does not, the fourth inquiry is whether the claimant's impairments prevent the performance of past relevant work. Id. §§ 404.1520(f),

416.920(f). By satisfying inquiry four, the claimant establishes a <u>prima</u> <u>facie</u> case of disability. <u>Hall v. Harris</u>, 658 F.2d 260, 264 (4th Cir. 1981). The burden then shifts to the Commissioner, <u>McLain v. Schweiker</u>, 715 F.2d 866, 868-69 (4th Cir. 1983), and leads to the fifth and final inquiry: whether the claimant is able to perform other forms of substantial gainful activity, considering claimant's remaining physical and mental capacities and claimant's age, education and prior work experience. <u>Id</u>. §§ 404.1520(g), 416.920(g). The Commissioner must show two things: (1) that the claimant, considering claimant's age, education, work experience, skills and physical shortcomings, has the capacity to perform an alternative job, and (2) that this specific job exists in the national economy. <u>McLamore v. Weinberger</u>, 538 F.2d 572, 574 (4th Cir. 1976).

## **Summary of ALJ's Decision**

In this particular case, the ALJ determined that Claimant met the requirements for insured worker status through June 30, 2016. (Tr. at 19, Finding No. 1.) Moreover, the ALJ determined that Claimant satisfied the first inquiry because she had not engaged in substantial gainful activity since October 27, 2011, the alleged onset date. (<u>Id</u>., Finding No. 2.) Under the second inquiry, the ALJ found that Claimant suffered from the following severe impairments: obesity; degenerative disc disease of the cervical and lumbar spine; and coronary artery disease with pitting edema. (<u>Id</u>., Finding No. 3.) At the third inquiry, the ALJ concluded that Claimant's impairments did not meet or equal the level of severity of any listing in 20 C.F.R. Part 404, Subpart P, Appendix 1. (Tr. at 22, Finding No. 4.) The ALJ then found that Claimant had the residual functional capacity ("RFC") to perform sedentary work

> except she could never climb ladders, ropes or scaffolds, but could occasionally climb ramps and stairs. She can occasionally balance, stoop, kneel, crouch, and crawl. The claimant can have no exposure to unprotected heights or loud industrial-type background noise. She can reach overhead and frequently reach in all other directions with bilateral upper extremities.

(Tr. at 22-23, Finding No. 5.)

At step four, the ALJ found that Claimant had no past relevant work. (Tr. at 25, Finding No. 6.) The ALJ then determined that based on Claimant's age, education, ability to communicate in English, and the immateriality of transferability of Claimant's job skills, that the RFC supported a finding that there are other jobs in the national economy that Claimant can perform. (Tr. at 26, Finding Nos. 7-10.) Ultimately, the ALJ determined that Claimant had not been under a disability from October 27, 2011 through the date of the decision. (Tr. at 27, Finding No. 11.)

**Claimant's Challenges to the Commissioner's Decision**

Claimant asserts two main grounds of error in support of her appeal.

The first is that the ALJ failed to consider all the medical evidence of record concerning the severity of Claimant's pitting edema in her lower legs, especially since he found it to be a severe impairment at step two. (Document No. 12 at 7-8.) Claimant argues the ALJ made mistakes of fact in the evidence regarding the treatment for Claimant's severe impairment that resulted in a flawed credibility finding, RFC assessment, and the decision denying her benefits. (Id. at 8-9.) Specifically, the ALJ minimized the considerable evidence concerning Claimant's inability to use certain medication to treat her edema and was referred to another doctor for an Unna Boot[2] evaluation, as she had difficulty wearing prescription compression socks. (Id.) Had the ALJ

_____

[2] Both counsel for Claimant and the Commissioner have provided descriptions of the Unna Boot from www.vitalitymedical.com to assist in the undersigned's understanding of Claimant's treatment for edema: An Unna Boot is a compression dressing, usually made of cotton, that has a zinc oxide paste applied uniformly to the entire bandage. The zinc oxide paste in the Unna Boot helps ease skin irritation and keeps the area moist. The zinc promotes healing within wound sites, making it useful for burns and ulcers. Zinc oxide paste is superior to gelatins used in other dressings, because it does not harden or cake. Some Unna Boots also contain calamine lotion and glycerin. Unna Boots are used to treat edema, ulcers and sores. In general, Unna Boots are used to treat wounds with light to moderate drainage and sometimes used with hydrogel dressings. Unna Boots are more commonly used for patients who are active and can move on their own, as opposed to patients who are confined to a wheelchair or bed.

properly analyzed the medical evidence concerning this impairment, it would have made a major difference in the findings. (Id. at 9-10.)

The second alleged ground of error is that the ALJ did not properly consider and weigh the opinion provided by Claimant's treating physician, James G. Gaal, D.O. (Id. at 10-12.) The ALJ gave Dr. Gaal's opinion little weight, and further totally disregarded certain portions of his opinion in contravention to the Regulations, rendering the decision unsupported by substantial evidence (Id. at 12-13.)

Claimant asks the Court to reverse and remand the final decision for an award of benefits or for a correction of the errors made below. (Id. at 13.)

In response, the Commissioner contends the ALJ considered Claimant's severe impairment of coronary artery disease with pitting edema at each step in the sequential evaluation process, which included the evidence provided by her treating physicians, and accommodated this impairment, as well as the other impairments, to a much reduced range of sedentary work. (Document No. 13 at 11.) The Commissioner also points out that the evidence showed that Claimant's edema waxed and waned over the relevant period, and it did not interfere with her ability to walk and stand. (Id. at 12.) Further, the medical records belie Claimant's assertion that her edema prevented her from using compression hose and that she needed a more intensive treatment with an Unna Boot. (Id. at 13-14.)

Next, the Commissioner argues that the ALJ gave the appropriate weight to Dr. Gaal's opinion because his findings for more extreme limitations were not supported by the evidence of record, particularly by the clinical findings of treating and examining physicians. (Id. at 14-15.) With respect to Claimant's assertion that the ALJ did not address certain portions of Dr. Gaal's

opinion, the Commissioner states that Dr. Gaal did not provide any medical or clinical findings to support them, and further, they were not supported by the evidence of record, but only by Claimant's own statements. (Id. at 15-16.)

The Commissioner asks the Court to affirm the final decision, because it is supported by substantial evidence. (Id. at 16.)

In reply, Claimant argues that the ALJ failed to consider all the evidence as mandated, and that the Commissioner provides *post hoc* rationale for the ALJ's evaluation of Dr. Gaal's opinion, and further, the ALJ did not adequately explain his reasons for discounting the treating physician's opinion. (Document No. 14 at 1-3.) Claimant renews her request for an order reversing and remanding the final decision to correct these errors. (Id. at 3.)

## The Relevant Evidence of Record[3]

The undersigned has considered all evidence of record, including the medical evidence, pertaining to Claimant's arguments and discusses it below.

Wirt County Health Services Associates, Inc.:

Prior to her alleged onset date, Claimant sought treatment from Ronald E. Greer, M.D. through August 2013 for a variety of maladies including headaches, dizziness, edema, upper respiratory infections, cervical spine pain, and bronchitis. (Tr. at 378, 369.) At these appointments, Claimant frequently reported being self-reliant in her usual daily activities. (Tr. at 319, 335, 339, 343, 347, 351, 355, 359, 362, 366, 369, 379.) During clinical examinations, she frequently had normal sensation, normal deep tendon reflexes, and a normal ability to stand and walk. (Tr. at 370-371, 374, 380.)

---

[3] The undersigned focuses on the relevant evidence of record pertaining to the issues on appeal as referenced by the parties in their respective pleadings.

In November 2011, an x-ray of Claimant's cervical spine revealed degenerative disc disease. (Tr. at 405.) In October 2012 and May 2013, she had negative straight-leg raising. (Tr. at 340, 348.) Dr. Greer encouraged Claimant to exercise. (Tr. at 320, 336.)

On August 21, 2013, Claimant complained of edema in her lower legs. (Tr. at 318.) Claimant reported being self-reliant in her usual daily activities. (Tr. at 319.) Dr. Greer observed that she had pretibial pitting edema of both lower extremities without varicosity changes. (Tr. at 320.) He instructed Claimant to continue taking a diuretic, start counting calories, start an exercise program, and stop smoking. (Id.)

Pleasant Valley Neurophysiology Center:

Claimant received treatment at Pleasant Valley Neurophysiology Center from March 2012 until July 2013. (Tr. at 253-299.) On March 6, 2012, Claimant complained of headaches, spine pain, and numbness in her face, arms, and legs. (Tr. at 253.) On examination, Robert L. Lewis, II, M.D., noted that Claimant had mild edema of her right leg, but otherwise had normal strength and range of motion in all extremities. (Tr. at 255.) While Claimant did have absent ankle reflexes, she otherwise had normal sensation in her extremities and a normal ability to stand and walk. (Tr. at 256.)

On April 18, 2012, Claimant continued to have absent ankle reflexes and mild edema in her right leg, as well as a normal gait, normal muscle strength, and could stand without difficulty. (Tr. at 272.) One month later, her examination remained unchanged. (Tr. at 298.) In July 2012, her examination remained unchanged (Tr. at 292.); by September 5, 2012, Claimant stated that she could not work due to leg pain. (Tr. at 283.) It was noted she had normal muscle strength of her lower extremities, mild edema of her right leg, no ankle reflexes, and pedal pulses 1+ bilaterally.

(Tr. at 285.)

On May 21, 2013, Claimant had +1 edema, weakness in her lower extremities, and an antalgic gait. (Tr. at 278.) On July 1, 2013, Claimant continued to complain of numbness and spine pain, and that she could not work because of leg and joint pain. (Tr. at 258.) She had 1+ edema and weakness in her lower extremities as well as absent ankle reflexes and a painful gait. (Tr. at 260.)

West Virginia Heart and Vascular Institute:

On December 5, 2012, Mitchell Rashid, M.D., examined Claimant due to her complaints of lower extremity edema, chest discomfort, dyspnea, fatigue, and orthopnea. (Tr. at 309.) Dr. Rashid administered an EKG that revealed no abnormalities. (Id.) On examination, Claimant had 2+ edema of her lower extremities but could stand and walk without difficulty. (Tr. at 311.) Dr. Mitchell recommended that Claimant wear a Holter monitor and to obtain an echocardiogram. (Id.)

On March 12, 2013, Claimant underwent a heart catheterization, angiogram, and ventriculogram due to complaints of shortness of breath and chest pain. (Tr. at 313.) The studies revealed mild non-obstructive coronary artery disease in the mid-right coronary artery, mild myocardial bridging in the mid to distal left anterior descending artery, and normal left ventricular function. (Tr. at 314.) On April 17, 2013, Claimant had 2+ edema of her lower extremities but retained a normal ability to stand and walk. (Tr. at 305.)

Claimant returned to West Virginia Heart and Vascular Institute on April 18, 2014, and had 1+ edema in her lower extremities. (Tr. at 506.) Howard K. Fletcher, NP, a nurse practitioner, recommended Claimant lose weight, exercise, and stop smoking. (Id.) By the following December, Claimant had 3+ edema of her ankles; Nurse Fletcher instructed Claimant to maintain a low salt

diet, prescribed Lasix and Metalozone, and instructed her to use compression hose if she was still experiencing similar edema. (Tr. at 503.)

Jackson General Hospital:

An x-ray taken on November 7, 2013, revealed Claimant had minimal degenerative change of the lower cervical spine. (Tr. at 434.) A chest x-ray taken the same day revealed no evidence of acute disease. (Id.) On December 12, 2013, Claimant underwent a venous study due to swelling in her lower legs; it did not reveal any evidence of deep venous thrombosis. (Tr. at 425.)

Claimant had another chest x-ray on May 14, 2014, that once again revealed no evidence of acute cardiopulmonary disease. (Tr. at 487.) She also underwent a second venous study on May 20, 2014, that again revealed no evidence of deep venous thrombosis. (Tr. at 492.)

An August 29, 2014 x-ray of Claimant's lumbar spine showed minimal degenerative change. (Tr. at 514.) A third chest x-ray in November 2014 revealed no acute cardiopulmonary disease. (Tr. at 515.) A fourth chest x-ray in January 2015 was again normal. (Tr. at 518.)

A third venous study of Claimant's lower extremities performed in December 2014 was once again negative for any evidence of deep venous thrombosis. (Tr. at 516.)

A magnetic resonance imaging (MRI) study in February 2015 revealed Claimant had a moderate to severe disc bulge at the L1-L2 level but no other abnormalities. (Tr. at 519.)

James G. Gaal, D.O.:

Dr. Gaal treated Claimant from October 2013 through January 2015. (Tr. at 563-599, 605-718.) During this time, Claimant exhibited different degrees of edema in her extremities varying from none (Tr. at 605, 613, 616, 628, 631, 634, 637, 640, 643, 655.), 1+ (Tr. at 610, 652, 658, 661.), 2+ (Tr. at 624, 649.), and 3+. (Tr. at 620.) She also more frequently than not had a normal

ability to stand and/or walk (Tr. at 606, 609, 613, 616, 621, 625, 632, 637, 640, 643, 646, 649, 656, 658.), as opposed to an abnormal ability to stand and/or walk. (Tr. at 629, 652, 661.) Claimant also typically had normal neurological examinations including normal muscle strength in her extremities, normal sensation, and good range of motion (Tr. at 605-06, 610, 613, 616, 621, 625, 632, 637, 640, 643-44, 646-47, 649-50, 656, 658.), but only some infrequent abnormalities. (Tr. at 634, 652.)

On May 7, 2014, Dr. Gaal completed a medical assessment of Claimant's ability to perform physical work-related activities. (Tr. at 408-411.) He noted that she could only occasionally lift up to 5 pounds, and stand and walk for 10 minutes during an 8-hour workday due to low back pain. (Tr. at 408.) Dr. Gaal noted that Claimant could never perform any postural activities other than occasionally balancing due to back and leg pain. (Tr. at 409.) He determined Claimant could not work around heights or vibrations and could only occasionally reach, handle, finger, or feel. (Tr. at 409-410.)

On July 21, 2014, Claimant presented to Dr. Gaal to complete paperwork stating she is disabled or cannot work so that she could obtain food stamps. (Tr. at 637.) It was noted that she had no edema, no neurological deficits, a normal gait, full range of motion of the neck, no tenderness to palpation of the cervical, dorsal, or lumbosacral spine area. (Id.)

GurPreet S. Brar, M.D.:

Dr. Gaal referred Claimant to Dr. Brar, a rheumatologist, on March 25, 2014. (Tr. at 600.) She complained of neck and lumbar spine pain. (Id.) On examination, Claimant had limited range of motion in her lumbar spine due to complaints of pain. (Id.) She also had "fairly severe pitting edema from the knees down to her feet." (Id.) Claimant had normal muscle strength and no evidence of trigger/tender points. (Id.) Dr. Brar noted that he found no evidence of an identifiable

rheumatic disease and recommended an aggressive program of weight loss and muscle conditioning as tolerated. (Id.) Following Dr. Brar's examination, x-rays of Claimant's sacroiliac joints and knees were unremarkable. (Tr. at 601-602.)

Carl Overmiller, M.D.:

Dr. Gaal referred Claimant to Dr. Overmiller on March 2, 2015 for consultation for an Unna Boot. (Tr. at 526.) Dr. Overmiller noted that Claimant had not been told that she had congestive heart failure. (Id.) She advised that she had a prescription for T.E.D. hose[4], but was unable to wear them due to her edema. (Id.) On examination, Claimant had 2+ edema to her mid-calf, but no skin break down or evidence of cellulitis. (Tr. at 527.) She had a full range of motion of her extremities and no sensory or motor deficits. (Id.)

Dr. Overmiller did not recommend an Unna Boot, but did strongly recommend that Claimant stop smoking, that she needed to lose weight, increase her activity, maintain fluid balance, and start wearing her T.E.D. hose. (Tr. at 527-528.) He also recommended that she speak with her cardiologist and Dr. Gaal about her "yoyo" use of diuretics and her fluid intake. (Id.)

State Agency Medical Consultants:

On October 22, 2013, Thomas Lauderman, D.O. reviewed the evidence of record and completed a residual functional capacity assessment of Claimant's ability to perform physical work-related activities. (Tr. at 68-69.) Dr. Lauderman opined that Claimant could occasionally lift and/or carry 50 pounds, frequently lift and/or carry 25 pounds, stand and/or walk about 6 hours during an 8-hour workday, and sit about 6 hours during an 8-hour workday. (Tr. at 69.)

---

[4] The Commissioner provided a reference describing this hose: per www.vitalitymedical.com, T.E.D. is one of the manufacturers for compression stockings or socks, also referred to as anti-embolism stockings, used to treat venous and lymphatic medical problems. These stockings help to prevent blood pooling in legs that can clot and result in venous thrombosis or deep vein thrombosis. (Document No. 13 at 8, fn.3.)

On December 13, 2013, Fluvio Franyutti, M.D. reviewed the evidence of record and completed a residual functional capacity assessment form. (Tr. at 85-87.) Dr. Franyutti found that Claimant could occasionally lift and/or carry 20 pounds, frequently lift and/or carry 10 pounds, stand and/or walk about 6 hours during an 8-hour workday, and sit about 6 hours during an 8-hour workday. (Tr. at 85.) He also found Claimant could never climb ladders, ropes, or scaffolds, but could occasionally climb ramps and stairs, balance, stoop, kneel, crouch, and crawl. (Tr. at 85-86.) Dr. Franyutti also indicated that Claimant needed to avoid concentrated exposure to temperature extremes, vibration, fumes, odors, dust, gases, and poor ventilation and even moderate exposure to hazards. (Tr. at 86.)

**The Administrative Hearing**

Claimant Testimony:

Claimant last worked in October 2011 as a service attendant at a Taco Bell; she explained that she was no longer able to work because of swelling that kept her from wearing shoes. (Tr. at 41.) She stated the doctors were still trying to figure out what was causing her swelling and had prescribed fluid pills and a potassium supplement. (Tr. at 42-43.) She confirmed she had been diagnosed with coronary artery disease. (Tr. at 42.) Claimant testified that while she was not in congestive heart failure, at her most recent visit with Dr. Rashid, she was told she had too much fluid around her heart and lungs. (Tr. at 43.) She stated the increased dosage of Lasix had not helped with getting the fluid off, but that if she did not take the pill, her skin would burn. (Tr. at 44.)

At this point, Claimant requested permission to stand because she was uncomfortable sitting during the hearing. (Id.) She confirmed that she was wearing compression hose at the

hearing and stated that she had three sets of hose. (Tr. at 45.) Claimant testified she could sit for approximately 30 minutes at a time but would need to stand to alleviate the pain and numbness in her back and legs. (Id.) She stated she would need to walk for 10 minutes before sitting down again. (Id.) Claimant explained that she elevated her legs when she was able, but that sometimes the swelling was so bad in her knees that she could not get her feet propped up. (Id.) She stated she had been referred for physical therapy but experienced pain when touched. (Tr. at 46.)

Claimant testified that she could not wear socks because her legs would bruise. (Tr. at 48.) Her 13-year-old daughter assisted her with household chores and personal care, including washing her feet and helping her dress. (Id.) She stated she spent most of her day lying on the couch and was unable to drive because her numbness prevented her from feeling the gas and brake pedal. (Tr. at 50.) Claimant described pain and numbness in her upper extremities as well as headaches. (Tr. at 50-51.) She stated Lyrica had reduced the frequency of her headaches to four or five a month, but made no difference in the numbness. (Tr. 48, 51.)

Claimant testified she was unable to lose weight due to fluid retention. (Tr. at 54.) She indicated she currently had 40 to 50 pounds of extra fluid in her body. (Id.)

William Tanzey, Vocational Expert ("VE") Testimony:

The VE characterized Claimant's past work to include fast food worker and waitress, both at the unskilled, light level. (Tr. at 57.) The ALJ asked the VE whether work was available to a hypothetical individual with Claimant's vocational profile and a light RFC with additional non-exertional limitations. (Tr. at 61.) The VE named three representative jobs. (Id.) The VE confirmed that an individual limited to occasional overhead reaching and frequent reaching in all other directions bilaterally could perform these positions. (Id.)

The VE then named three representative jobs that could be performed by an individual with Claimant's vocational profile and limited to sedentary work: receptionist; security monitor; and product grader. (Tr. at 61-62.) The VE again confirmed the named occupations would be available with the additional limitation of frequent grasping, handling, fingering, and feeling. (Tr. at 62.) The VE further stated that an individual also requiring the ability to elevate her legs for two hours per day or limited to only occasional grasping, fingering, and feeling would be unable to perform work. (Id.) Likewise, an individual who was absent from work two or three days per month on an unscheduled basis or was off task 60 to 90 minutes per day would be unable to sustain competitive employment. (Tr. at 62-63.)

**Scope of Review**

The sole issue before this Court is whether the final decision of the Commissioner denying the claim is supported by substantial evidence. In Blalock v. Richardson, substantial evidence was defined as:

> evidence which a reasoning mind would accept as sufficient to support a particular conclusion. It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance. If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is 'substantial evidence.'

Blalock v. Richardson, 483 F.2d 773, 776 (4th Cir. 1972) (quoting Laws v. Celebrezze, 368 F.2d 640, 642 (4th Cir. 1966)). The Commissioner, not the Court, is charged with resolving conflicts in the evidence, however, the Court determines if the final decision of the Commissioner is based upon an appropriate application of the law. Hays v. Sullivan, 907 F.2d 1453, 1456 (4th Cir. 1990). The Courts "must not abdicate their traditional functions; they cannot escape their duty to scrutinize the record as a whole to determine whether the conclusions reached are rational." Oppenheim v. Finch, 495 F.2d 396, 397 (4th Cir. 1974). If substantial evidence exists, then the

Court must affirm the Commissioner's decision "even should the court disagree with such decision." Blalock, 483 F.2d at 775.

**Analysis**

Consideration of All Medical Evidence:

As stated previously, Claimant argues that the ALJ failed to consider all the medical evidence with respect to her edema, and his omission and contradictory findings regarding such evidence could have made a major difference in his decision. See, generally, Meadows v. Colvin, No. 1:14-cv-15147, 2015 WL 3820609 (S.D.W. Va. June 18, 2015).[5] As noted *supra*, the ALJ determined that Claimant's coronary artery disease with pitting edema was a severe impairment because it caused significant limitations in her ability to perform basic work activities. (Tr. at 19, 20.)

With regard to the evidence concerning this impairment, the ALJ first noted that Claimant testified that she last worked in 2011, in a part-time capacity, and that she "described swelling in her lower extremities for which she takes a fluid pill twice a day." (Tr. at 23.) Further, the ALJ acknowledged that Claimant alleged that "her legs will go numb is she sits too long, and reported she keeps her legs elevated as much as possible." (Id.)

Regarding the medical evidence of record documenting Claimant's edema, the ALJ noted that Claimant sought treatment in November 2011 with her primary care physician, Ronald Greer, M.D. for bilateral pretibial pitting edema, recurrent, for which she was prescribed a fluid pill.[6] (Id.)

---

[5] The undersigned notes that the ALJ's review of the medical evidence of record regarding Claimant's edema issues did not contain the omissions of evidence akin to the situation in Meadows, thus warranting remand. As explained *infra*, the evidence of record, including Claimant's own statements, simply do not rise to reversible error on this issue.

[6] The undersigned notes that Dr. Greer's treatment notes concerning edema pre-dated Claimant's alleged onset date. (Tr. at 382-391.)

The ALJ further noted that Claimant continued to have edema and she also complained of chronic lower back pain in October 2012. (Id.) The ALJ then discussed the medical evidence that concerns Claimant's referral to Mitchell Rashid, M.D. in December 2012 "due to dyspnea, lower extremity swelling, and frequent episodes of moderate chest discomfort." (Id.) The ALJ proceeded to discuss Claimant's cardiac catheterization on May 12, 2013, revealing mild non-obstructive coronary artery disease, for which she was prescribed medication. (Id.)

The ALJ noted that Claimant established care with Dr. Gaal in October 2013, and that she "reported a temporary decrease in her lower extremity edema when taking Metolazone, but indicated that her swelling returned once she was again taking only Lasix. (Tr. at 23-24.) The ALJ noted that in November 2014, Dr. Gaal reported Claimant's lower extremity edema was at 3+, and a month later prescribed her compression socks and instructed her to elevate her feet while sitting. (Tr. at 24.)

Continuing with Claimant's edema issues, the ALJ acknowledged that in March 2015, she was referred to Dr. Overmiller for evaluation of an Unna boot. (Id.) The ALJ noted further that "[a]lthough she had been prescribed compression socks, the claimant admitted to Dr. Overmiller that she did not wear them due to the edema. Dr. Overmiller reported 2+ pitting edema", but that Claimant had also not been placed on fluid restriction and she was not diagnosed with congestive heart failure and tested "consistently negative" for deep vein thrombosis. (Id.) The ALJ acknowledged that Dr. Overmiller "strongly recommended [Claimant] wear her compression socks, increase her activity, and maintain a fluid balance. Meanwhile, the claimant was prescribed six weeks of physical therapy for her back pain which was to begin April 6, 2015."[7] (Tr. at 24,

---

[7] Additionally, the St Mary's Physical Medicine and Rehabilitation visit summary "plan" indicated "[s]trategies discussed for edema management. Will consider UNNA boot application for lower extremities[.]" (Tr. at 562.)

520-560, 561-562.)

The ALJ first recognized that Claimant "sought treatment from various specialists but she has not generally received the type of medical treatment one would expect for a totally disabled individual." (Id.) The ALJ next "acknowledges the severity of the claimant's lower extremity edema, but notes the claimant was not always compliant with treatment, admitting she did not take her Lasix in January 2015, or wear her compression stockings as recommended (Exhibit 9F and 13F)." (Tr. at 24, 520-541, 605-718.) The ALJ also noted that Claimant did not report side effects from her medications to her medical providers, she continued to take the same medicines, and concluded the side effects are mild and would not significantly interfere with performing work activities. (Tr. at 24.)

Other non-medical evidence the ALJ reviewed concerned Claimant's daily activities, which he acknowledged Claimant asserted that they were "fairly limited" insofar as she had her 13-year old daughter performing the grocery shopping by getting a ride to the store from a neighbor, the ALJ noted Claimant alleged in her Function Report that she could drive and grocery shopped once or twice each week. (Tr. at 24-25.) Additionally, Claimant "indicated that she could walk a half mile, and attempted to perform cleaning chores, laundry, and mowing." (Tr. at 25, 209-216.)

Overall, the ALJ herein examined all the relevant evidence, including the medical evidence of record, in his analysis and consideration of Claimant's edema. Though Claimant argues that the ALJ "minimized" evidence that Lasix was ineffective in treating her edema and that he "overlooked or ignored evidence" that her severe edema prevented her from wearing her prescribed compression socks, the undersigned finds no merit to this argument. It is clear that the ALJ reviewed this evidence, moreover, the ALJ's review of the evidence indicated that Claimant's edema did not

cause significant functional limitations, specifically with walking or standing. Indeed, Claimant's medical providers recommended she participate in a six-week physical therapy program that would have addressed not only her back pain, but also her edema management. Additionally, specialist Dr. Overmiller, to whom Claimant's primary care provider referred her because of her edema issues, "strongly recommended" that she wear her compression socks (Tr. at 528.), despite her protests to wearing them, and perhaps more importantly, that she "increase her activity." (Tr. at 527.) Such recommendations do not support her allegations that her edema was totally disabling.

Accordingly, the undersigned **FINDS** the ALJ considered all the medical evidence of record with respect to Claimant's severe impairment of coronary artery disease with pitting edema,[8] that he fulfilled his obligations with regard to same in accordance with the Regulations, and his findings and conclusions regarding this severe impairment are supported by the substantial evidence.

Evaluating Treating Physician Opinion:

Claimant alleges that the ALJ failed to adhere to the Regulations in evaluating the opinion provided by her treating physician, Dr. Gaal. With respect to the opinions of treating sources, the Commissioner generally must give more weight to the opinion of a treating physician because the physician is often most able to provide "a detailed, longitudinal picture" of a claimant's alleged disability. See 20 C.F.R. §§ 404.1527(c)(2), 416.927(c)(2). Nevertheless, a treating physician's opinion is afforded "controlling weight only if two conditions are met: (1) that it is supported by clinical and laboratory diagnostic techniques and (2) that it is not inconsistent with other substantial evidence." Ward v. Chater, 924 F. Supp. 53, 55 (W.D. Va. 1996); see also, 20 C.F.R.

---

[8] Dr. Gaal's medical opinion, discussed *infra*, interestingly does not mention Claimant's edema as a disabling impairment, and is primarily focused on her back pain with respect to his physical assessment of Claimant's work-related activities; this further bolsters the ALJ's findings and conclusions with regard to Claimant's edema impairment.

§§ 404.1527(c)(2), 416.927(c)(2). The opinion of a treating physician must be weighed against the record as a whole when determining eligibility for benefits. 20 C.F.R. §§ 404.1527(c)(2), 416.927(c)(2). Ultimately, it is the responsibility of the Commissioner, not the court, to review the case, make findings of fact, and to resolve conflicts of evidence. Hays v. Sullivan, 907 F.2d 1453, 1456 (4th Cir. 1990). As noted above, however, the Court must not abdicate its duty to scrutinize the record as a whole to determine whether the Commissioner's conclusions are rational. Oppenheim v. Finch, 495 F.2d 396, 397 (4th Cir. 1994).

If the ALJ determines that a treating physician's opinion should not be afforded controlling weight, the ALJ must then analyze and weigh all the evidence of record, taking into account the factors listed in 20 C.F.R. §§ 404.1527(c)(2)-(6), 416.927(c)(2)-(6). These factors include: (1) Length of the treatment relationship and frequency of evaluation, (2) Nature and extent of the treatment relationship, (3) Supportability, (4) Consistency, (5) Specialization, and (6) various other factors. Additionally, the Regulations state that the Commissioner "will always give good reasons in our notice of determination or decision for the weight we give your treating source's opinion." Id. §§ 404.1527(c)(2), 416.927(c)(2).

In this case, the ALJ noted that Claimant's treating physician, Dr. Gaal, completed a Medical Assessment of Claimant's Physical Ability to Perform Work-Related Activities on May 7, 2014, described in detail, *supra*. The ALJ gave this opinion "little weight" stating,

> [I]t is not supported by the evidence of record. Dr. Gaal notes the claimant could lift no more than five pounds, yet the claimant reported she could lift up to 30 pounds, although it caused back pain. While Dr. Gaal indicated the claimant could walk no more than 10 minutes, the claimant stated she could walk approximately a half mile before needing to stop and rest. Dr. Gaal's opinion contains internal inconsistencies as well. He stated the claimant could sit for eight hours during an eight-hour workday, but could only sit 30 minutes without interruption (Exhibits 3E and 5F).

(Tr. at 25, 209-216, 408-412.)

The ALJ's discussion of the "evidence of record" included Claimant's history of musculoskeletal complaints as well as numbness in her hands and feet, and that she reported these problems to Dr. Brar, who despite diagnosing Claimant with fibromyalgia but still noting the absence of trigger/tender points, recommended "an aggressive program of weight loss and muscle conditioning[.]" (Tr. at 20, 600-604.) The ALJ also acknowledged that both Drs. Brar and Gaal noted that due to Claimant's report of knee pain, she "had no cartilage in her knees. However, x-rays of bilateral knees taken on March 25, 2014 revealed the joint spaces were well maintained with no significant degenerative joint disease (Exhibits 5F and 12F)."[9] (Tr. at 20, 408-412, 600-604.)

The ALJ considered Claimant's statements in her Function Report submitted in October 2013, wherein she stated she cared for her daughter and pet dogs, cooked two to three complete meals each week, attempted to exercise, clean her home, that she could drive and shop once or twice a week. (Tr. at 21.) The ALJ acknowledged Claimant's assertions that she had difficulty maintaining personal grooming due to her physical problems. (Id.) Additionally, the ALJ noted Claimant "regularly went to church and to the park with her daughter[.]" (Id.)

The ALJ noted in October 2013, Dr. Gaal reported Claimant had full range of motion in her neck, no tenderness upon palpation along the entire spine and that cervical x-rays revealed minimal degenerative changes. (Tr. at 23-24.) The ALJ considered Dr. Gaal's findings in August 2014 and November 2014 that Claimant had tenderness in her lumbar spine, and in November, she had a positive straight leg raising in her left leg, and that her edema in her lower extremity was 3+. (Tr. at 24.) In addition, the ALJ noted the February 28, 2015 MRI study of Claimant's lumbar spine

---

[9] The undersigned finds these physicians' opinions that Claimant's knees had no cartilage entirely incongruous with the x-ray evidence indicating the opposite.

revealed a disc bulge at L1-L2, with no disc herniation, spinal stenosis, or compromise of the exit neural foramen. (Id.)

The ALJ provided an adequate narrative explaining why he gave Dr. Gaal's opinion "little weight" that lends itself to meaningful judicial review. Accordingly, the undersigned **FINDS** the ALJ's evaluation of Claimant's treating physician opinion evidence is supported by substantial evidence.

Further, in accordance with this Court's duty to scrutinize the record as a whole, the undersigned **FINDS** the Commissioner's conclusion that Claimant was not disabled was "rational" and supported by substantial evidence. Oppenheim v. Finch, 495 F.2d at 397.

## Recommendations for Disposition

For the reasons set forth above, it is hereby respectfully **PROPOSED** that the District Court confirm and accept the foregoing findings and **RECOMMENDED** that the District Court **DENY** the Claimant's request for judgment on the pleadings (Document No. 12.), **GRANT** the Defendant's request to affirm the decision below (Document No. 13.), **AFFIRM** the final decision of the Commissioner, and **DISMISS** this matter from the Court's docket.

The parties are notified that this Proposed Findings and Recommendation is hereby **FILED**, and a copy will be submitted to the Honorable John T. Copenhaver, Jr., United States District Judge. Pursuant to the provisions of Title 28, United States Code, Section 636(b)(1)(B), and Rules 6(d) and 72(b), Federal Rules of Civil Procedure, the parties shall have fourteen days (filing of objections) and then three days (mailing/service) from the date of filing this Proposed Findings and Recommendation within which to file with the Clerk of this Court, specific written objections, identifying the portions of the Proposed Findings and Recommendation to which

objection is made, and the basis of such objection. Extension of this time period may be granted for good cause shown.

Failure to file written objections as set forth above shall constitute a waiver of *de novo* review by the District Court and a waiver of appellate review by the Circuit Court of Appeals. Snyder v. Ridenour, 889 F.2d 1363, 1366 (4th Cir. 1989); Thomas v. Arn, 474 U.S. 140, 155 106 S.Ct. 466, 475, 88 L.E.2d 435 (1985), reh'g denied, 474 U.S. 1111, 106 S.Ct. 899, 88 L.E.2d 933 (1986); Wright v. Collins, 766 F.2d 841 846 (4th Cir. 1985); United States v. Schronce, 727 F.2d 91, 94 (4th Cir.), cert. denied, 467 U.S. 1208, 104 S.Ct. 2395, 81 L.E.2d 352 (1984). Copies of such objections shall be served on opposing parties, District Judge Copenhaver, and this Magistrate Judge.

The Clerk of this Court is directed to file this Proposed Findings and Recommendation and to send a copy of same to counsel of record.

ENTER: November 3, 2017.

Omar J. Aboulhosn
United States Magistrate Judge